## COMMONWEALTH *vs.* PAUL J. THIBEAULT.

No. 09-P-126.

Worcester. February 3, 2010. - August 23, 2010.

Present: KAFKER, VUONO, & SIKORA, JJ.

*Indecent Assault and Battery. Child Abuse. Evidence,* First complaint. *Witness,* Child, Competency. *Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel.

At the trial of a criminal complaint charging indecent assault and battery on a child under the age of fourteen, no substantial risk of a miscarriage of justice arose from the admission in evidence of testimony by the victim's mother as a first complaint witness, where, although the victim complained of the defendant's acts to her father first, the judge determined that the father was unavailable, and unavailability of the first person told of a sexual assault by a complainant is an exception under the first complaint doctrine. [421-423]

At the trial of a criminal complaint charging indecent assault and battery on a child under the age of fourteen, the judge properly determined, after holding a preliminary hearing, that the young child victim was competent to testify as a witness, where there was no clear error in the judge's rulings that the child had the general ability to observe, remember, and recount, and that the child possessed the ability to distinguish truth from falsehood, appreciated her duty to tell the truth, and understood that negative consequences would flow from her failure to do so. [423-431]

At the trial of a criminal complaint charging indecent assault and battery on a child under the age of fourteen, there was no error in the judge's declining to hold a pretrial competency hearing to determine whether preliminary interview techniques had tainted the child victim's anticipated trial testimony to such a degree that it was unreliable, where the record lacked any evidence of coercion, suggestion, or coaching of the victim's testimony deserving consideration of a "taint" hearing procedure. [432]

This court declined to consider a criminal defendant's claim, on direct appeal, that he received ineffective assistance of counsel, where the record was inadequate. [432-433]

COMPLAINT received and sworn to in the Fitchburg Division of the District Court Department on July 3, 2007.

The case was tried before *Elliott L. Zide,* J.

*Michael Bedard* for the defendant.

*Michelle R. King*, Assistant District Attorney, for the Commonwealth.

SIKORA, J. A District Court jury convicted the defendant, Paul J. Thibeault, of three counts of indecent assault and battery upon a child under the age of fourteen, G. L. c. 265, § 13B. On appeal he challenges the trial judge's rulings upon questions of first complaint witness status and victim competency, and the judge's refusal to hold a "taint hearing" on alleged improper coaching or influence of the victim's testimony. He claims further on direct appeal that his trial counsel was ineffective for failing to subpoena the victim's father. For the following reasons, we affirm the convictions.

*Background.* The jury received the following evidence. In February of 2007, the victim, Anna,[1] began sleeping at the home of her paternal grandparents three times per week to accommodate her parents' work schedule. On these overnight visits, Anna, then five years old, slept on a couch in the living room because no spare bedroom was available. The defendant, who is Anna's uncle, and another uncle, Michael, and his wife, Rita, also resided with the grandparents. All of the residents had bedrooms of their own.

Anna, who was six years old at the time of trial, testified that the defendant had touched her on three separate occasions as she slept on the couch. He placed his hands on various parts of her body, including her "private spot," the part of her body, she explained, that she used "to go pee." Anna's mother, Erika, testified as first complaint witness.[2] She recounted that on June 22, 2007, Anna and her father Dennis were playing a game together in Anna's bedroom when Anna told him that the defendant had made inappropriate contact with her. Dennis then brought Anna into the kitchen so that Anna could tell Erika about the defendant's actions. According to Erika, Anna told her that the defendant had touched her, pointing to the areas on her body where he made contact, at three different times in the living room when everyone else at her grandparents' house was asleep. Erika observed that Anna appeared nervous and scared as she described

---

[1] We use a pseudonym for the victim.

[2] The trial judge gave the jury a first complaint limiting instruction prior to Erika's testimony at trial and during his final charge to the jury.

the defendant's alleged behavior. Erika and Dennis contacted the Fitchburg police to report the incidents, and Anna's overnight visits to her grandparents' home ceased.[3]

The Commonwealth had subpoenaed Dennis, Anna's father, to act as first complaint witness; however, he did not appear when trial began. When she learned of the father's unavailability, the prosecutor sought to substitute Erika as first complaint witness prior to trial. The prosecutor explained that Dennis suffered from bipolar disorder, took his medications inconsistently, fled the Commonwealth, and refused to return. The trial judge granted the Commonwealth's request to call Erika as first complaint witness. Defendant's counsel objected to the judge's initial pretrial ruling but did not object to Erika's testimony at trial.

*Analysis.* The defendant imputed three errors to the trial judge: allowance of Erika to testify as a substituted first complaint witness; determinations of Anna's competence to testify; and refusal of a "taint hearing" upon the claim of improper influence or coaching of Anna's testimony. Additionally, the defendant claims for the first time on direct appeal that his trial counsel was ineffective. None of these contentions merits reversal of his convictions.

1. *First complaint witness.* Relying on *Commonwealth* v. *King,* 445 Mass. 217, 237-248 (2005), cert. denied, 546 U.S. 1216 (2006), the defendant contends that the trial judge should not have allowed Anna's mother Erika to testify as first complaint witness because Anna complained first about the defendant's acts to her father. Because our interpretation of the first complaint doctrine permits substitution of an individual other than the first recipient of the complaint in the circumstances presented here, the judge's allowance of Erika's testimony does not constitute reversible error.

"Testimony by the recipient of a complainant's first complaint of an alleged sexual assault regarding the fact of the first complaint and the circumstances surrounding the making of that first complaint, including details of the complaint, is admissible for the limited purpose of assisting the jury in determining whether to credit the complainant's testimony about the alleged sexual assault, not to prove the truth of the allegations." Mass.

---

[3]Anna's visits resumed once the defendant's residence at the grandparents' home had ended.

G. Evid. § 413 (2010). This rule derives from *Commonwealth v. King, supra,* in which the Supreme Judicial Court supplanted the fresh complaint doctrine with the first complaint doctrine. The first complaint doctrine's primary purpose "is to refute any false inference that silence is evidence of a lack of credibility on the part of [sexual assault] complainants." *Id.* at 243.

Under the doctrine, generally only the individual to whom the complainant first complained of the sexual assault may testify as first complaint witness. *Ibid.* However, "[i]n limited circumstances, a judge may permit the testimony of a complaint witness other than, and in lieu of, the very 'first' complaint witness." *Ibid.* By way of "example," the court anticipated that in situations "where the first person told of the alleged assault is unavailable, incompetent, or too young to testify meaningfully, the judge may exercise discretion in allowing one other complaint witness to testify." *Id.* at 243-244.

Later, in *Commonwealth v. Murungu,* 450 Mass. 441, 445-448 (2008), the court specifically identified two exceptions to the first complaint doctrine. These permitted a person other than the first recipient of information from the complainant to testify as the first complaint witness (1) if the victim's disclosure to "the first person does not constitute a complaint," or (2) if the victim complains first to an individual who "has an obvious bias or motive to . . . distort the victim's remarks." *Id.* at 446. The court explained that the *King* decision had not "set forth an exhaustive list of appropriate substitutions." *Id.* at 445. "Other exceptions are permissible based on the purpose and limitations of the first complaint doctrine." *Ibid.*

Here, the trial judge determined that Anna's father Dennis was unavailable.[4] See Mass. G. Evid. § 804(a)(5) (witness unavailable if "absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process or other reasonable means"). Unavailability of the first person told of the sexual assault by the complainant is an exception recognized by *King. Commonwealth v. Murungu,* 450 Mass. at 445. The judge's allowance of Erika's testimony accords with the doctrine's purpose and limitations to ensure that a "complainant

---

[4] The prosecutor stated that she had subpoenaed Dennis but that he had fled the Commonwealth and that his whereabouts remained unknown at the time of trial.

(who . . . may be still a child) [has] her credibility fairly judged on the specific facts of the case rather than unfairly by misguided stereotypical thinking"; and that the defendant receive "a trial [that is] free from irrelevant and potentially prejudicial testimony." *Commonwealth* v. *Arana*, 453 Mass. 214, 228 (2009). Indeed, the usual concerns about fabrication in delayed reporting by the complainant are diminished in a case such as this where a young child, who is less able to appreciate the seriousness of an improper touching, may be less likely to report it immediately than a mature adult. Finally, the contemporaneity between Anna's reports of the defendant's sexual assaults first to her father and then to her mother only moments later strengthens the propriety of the substitution because the closeness in time between the two communications approaches the character of a single continuous first complaint.

At pretrial, the judge ruled, over the defendant's objection, that Anna's mother could testify "as a first complaint witness, not as a substitution to anybody." Because the defendant did not preserve the issue for appellate review by renewed objection to Erika's testimony at trial, we review the judge's admission of her first complaint testimony at trial for a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Silva*, 431 Mass. 401, 405 (2000). Because our analysis shows that the substitution of Erika for Dennis as first complaint witness was proper, no risk of a miscarriage of justice resulted. Indeed, the unavailability of Dennis provided proper ground for Erika's testimony and precluded any error.

2. *Competency.* The defendant argues that the trial judge's colloquy concerning Anna's competency was inadequate to determine her ability to testify. Although this case presented the typically difficult and sensitive issue of the competence of a young child to testify upon the subject of a sexual offense, the judge resolved it correctly.

Pursuant to G. L. c. 233, § 20, as appearing in St. 1983, c. 145, "[a]ny person of sufficient understanding, although a party, may testify in any proceeding, civil or criminal." To determine witness competency, our courts apply "a two-prong test . . . : (1) whether the witness has the general ability or capacity to 'observe, remember, and give expression to that which she ha[s] seen, heard, or experienced'; and (2) whether she has

'understanding sufficient to comprehend the difference between truth and falsehood, the wickedness of the latter and the obligation and duty to tell the truth, and, in a general way, belief that failure to perform the obligation will result in punishment.' " *Commonwealth* v. *Monzon*, 51 Mass. App. Ct. 245, 248 (2001), quoting from *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 329 (1986). The same test applies to adults, children, and individuals subject to a disability. *Commonwealth* v. *Whitehead*, 379 Mass. 640, 656 (1980).

In circumstances of disputed capacity, the trial judge will first determine competence. *Commonwealth* v. *Widrick*, 392 Mass. 884, 888 (1984). "The judge is afforded wide discretion — indeed, is obliged — to tailor the competency inquiry to the particular circumstances and intellect of the witness." *Commonwealth* v. *Brusgulis*, 398 Mass. at 329-330. With respect to child witnesses, "[m]uch which cannot be reproduced by the printed words depends on the child's appearance and manner." *Commonwealth* v. *Tatisos*, 238 Mass. 322, 325 (1921). Accordingly, "[i]t is seldom that the discretion of the trial judge can be revised; its exercise must have been clearly erroneous to justify such action." *Commonwealth* v. *LeFave*, 407 Mass. 927, 942 (1990), quoting from *Commonwealth* v. *Tatisos, supra* at 325. "This is because the question for decision is almost always one of fact and hence not reviewable." *Commonwealth* v. *Tatisos, supra* at 325. In reviewing a trial judge's ruling on the competency of a witness, we will examine both the preliminary hearing and the witness's trial testimony. *Commonwealth* v. *Monzon, supra* at 249, citing *Kentucky* v. *Stincer*, 482 U.S. 730, 743 (1987).

The judge conducted a competency hearing, during which the prosecutor and the judge questioned Anna. The judge found that Anna had "adequate memory, adequate recall." He found also that, "[a]lthough she may not know the word 'promise,' she knows that she's expected to tell the truth and that if she doesn't tell the truth people will be disappointed in her and that they'll go away from her." Upon these findings, the judge ruled Anna competent to testify.

a. *Ability to observe, remember, and recount.* At the competency hearing and at trial, the prosecutor asked Anna various questions about her daily life. She gave appropriate answers to questions regarding her name, age, school attendance, and grade

level. Although she initially misidentified her teacher as Mrs. Wilson, she correctly referred to her as Mrs. Olson for the remainder of the competency hearing and at trial. Anna explained that her teacher wanted her to read books and "do ABC jobs," her favorite task. She was able to describe chores with which she helped her teacher at school and for which she received stickers as rewards for her assistance.

At trial, Anna correctly identified all the individuals living at her grandparents' home at the time of the events at issue.[5] She explained that she went on overnight visits to her grandparents when her parents were at work. She recalled that on her overnight stays she would bring her pajamas and her favorite toy and that she slept on the living room couch.

At points during the competency hearing and trial Anna experienced difficulty. She stated incorrectly that her baby brother had stayed at her grandparents' home when she was five years old, when, in fact, he had not yet been born.[6] Anna recounted that something bad had happened to her on the couch but then denied that anyone had done anything bad to her.[7] Anna did not recognize the defendant in the courtroom.[8] However, when shown a picture of him, she correctly identified him as her Uncle Paul. When pressed about her experience on the living room couch, Anna reported that her Uncle Michael had slept on the couch and yelled at her.[9] When questioned again about events on the couch

---

[5]At trial, Anna stated initially that only Michael and Rita lived with her grandparents. However, she later made clear that her Uncle Paul, the defendant, lived there as well in a room of his own. Although the defendant lived at Anna's grandparents' home at the time of the events at issue, he ceased to live there after these charges arose.

[6]It was true, though, that her baby brother had visited the grandparents' home with Anna after he was born.

[7] Q.: "Okay. So when you were in the living [room] on the couch, did something bad happen to you?"

A.: "Yes."

Q.: "Okay. And did someone do something to you bad?"

A.: "No."

[8]A police officer testified that the defendant's appearance had changed since Anna last saw him: he had gained weight and had shaved his goatee and mustache.

[9] Q.: "Okay. Anything else happen? Okay. Did something happen on the couch that you didn't like besides with Uncle Michael?"

A.: "I didn't like when he was sleeping on the couch."

with someone else, she answered, "No." Then, when asked
whether she knew the defendant, Anna testified that he had touched
her.[10] Anna recalled that the defendant had touched her neck,
shoulder, legs, and feet but denied any contact with other parts of
her body.[11] After further inquiry, Anna stated that the defendant
had made contact with her "private spot," but only after she had
expressed discomfort and embarrassment about her experience.[12]
Generally, when questions confused Anna, she responded with

[10] *Q.:* "Do you know Uncle Paul?"
   *A.:* "Yeah."
   *Q.:* "How do you know him?"
   *A.:* "Because he's the one who had touched me."

[11] *Q.:* "Okay. What part of your body?"
   *A.:* "Here, here, there, there."
   *Q.:* "Okay, when you say here, here, what part of that body is that?"
   *A.:* "Here, under my neck."
   . . .
   *Q.:* "And when you say here, here, here, what part of your body is
      that?"
   *A.:* "These are the part [*sic*] of my legs."
   *Q.:* "So he touched you on your leg?"
   *A.:* "And my feet."
   *Q.:* "And your feet. Did he touch you on any other part of your body?"
   *A.:* "No."
   . . .
   *Q.:* "And did you tell [your mother] where he touched you? Okay. Where
      did you say he touched you?"
   *A.:* "Right here, here, here, here, there."
   *Q.:* "So on your legs and on your shoulders?"
   *A.:* "And on my feet."
   *Q.:* "And on your feet. Did you tell [your mother] he touched you anywhere
      else?"
   *A.:* "No."
   *Q.:* "You don't remember?"
   *A.:* "No."

[12] *Q.:* "And when Uncle Paul was on the couch, he touched you on your
      feet and your shoulders; did he touch you anywhere else?"
   *A.:* "No, that's all."
   *Q.:* "That was all? But you told your mother something else?"
   *A.:* "Yeah."
   *Q.:* "What did you tell your mom?"

such answers as "It's a hard part" or "Because I don't really know this part."

Anna correctly and adequately answered many general questions about herself and her life. As reported in the marginal notes, she also gave some hesitant and equivocal answers. Additionally, Anna experienced moments of bewilderment, although when these occurred, she admitted to confusion and expressed her difficulty in comprehending the questions. Other minor or trivial inconsistencies arose in her testimony aside from those detailed here.

Upon the entirety of Anna's testimony, we cannot find the judge's ruling on her competency to be clearly erroneous. Her ability to answer questions adequately and appropriately about

---

*A.*: "I don't want to go there."

*Q.*: "You said you didn't want to go back to grammy's?"

*A.*: "Yeah."

. . .

*Q.*: "Okay. And you said you don't want to go back because Uncle Paul touched you?"

*A.*: "Yeah."

*Q.*: "And where did he touch you?"

*A.*: "I told you."

*Q.*: "Did you say something different before?"

*A.*: "I forgot."

. . .

*Q.*: "[Anna], do you remember saying on another date that Uncle Paul touched you in a different place?"

*A.*: "Yeah."

*Q.*: "And what was the different place that he touched you?"

*A.*: "On my private spot."

*Q.*: "And where is your private spot?"

*A.*: "Here."

*Q.*: "And what do you use that part of your body for?"

*A.*: "To go pee."

. . .

*Q.*: "Does it embarrass you when I ask you those questions?"

*A.*: "Yes."

. . .

*Q.*: "So for this jury today, where did Uncle Paul touch you, what part of your body?"

. . .

*A.*: "I'm still embarrassed."

herself supports the finding of competency. See *Commonwealth v. Monzon*, 51 Mass. App. Ct. at 249-250 ("See *Malchanoff v. Truehart*, 354 Mass. 118, 120-121 [1968] [child competent to testify where she gave accurate answers to questions about her age, her education, and attendance at church]; *Commonwealth v. Trowbridge*, 419 Mass. 750, 755 [1995] [child competent to testify where she gave accurate answers to questions about her religion, her grade in school, and the subjects she studied]"). The inconsistencies in her answers to various questions do not render the judge's determination clearly erroneous. See *Commonwealth v. Lamontagne*, 42 Mass. App. Ct. 213, 218 (1997) (inconsistency in a witness's testimony not usually a question of competency but one of credibility and weight for the factfinder to decide). We do not view the disparities in Anna's answers to be "so frequent [or] so severe as to show that her testimony in its entirety was beyond reasonable belief by a rational person." *Ibid.* The first prong of the competency test does not hold witnesses to a standard of strict consistency but rather requires of them a "general ability or capacity to 'observe, remember, and give expression to that which she ha[s] seen, heard, or experienced.'" *Commonwealth v. Monzon*, 51 Mass. App. Ct. at 248, quoting from *Commonwealth v. Brusgulis*, 398 Mass. at 329. See G. L. c. 233, § 20.

Finally, in a case presenting the testimony of a child witness, we acknowledge the unique position of the trial judge. His or her determination rests upon a firsthand questioning of the child at the preliminary hearing and direct observation of her at both the hearing and the trial. In the absence of a clearly contradictory record, the judge's assessment of the demeanor, vocabulary limits, comprehension, and attention of a young child defies easy review and receives considerable respect. See *Commonwealth v. Tatisos*, 238 Mass. at 325.

b. *Ability to distinguish truth from falsehood.* Anna also answered various questions designed to determine her ability to understand the difference between truth and falsehood, appreciate her duty to tell the truth, and generally apprehend that her failure to do so would result in punishment. See G. L. c. 233, § 20. As with other general questions about her capacity and experience, she progressed through some difficulties to testimony ultimately coherent and reliable.

At the competency hearing, Anna stated that she knew the difference between the truth and a lie, and that it was good to tell the truth and bad to tell a lie. At first, she found it difficult to explain the consequences of failing to tell the truth.[13] She first identified the statement that "today is Christmas" as true, but then stated that it was a lie. When the prosecutor asked Anna about the color of her shirt, Anna needed several attempts to answer the question correctly.[14]

The trial judge, too, questioned Anna to determine her competency. He asked her whether she knew what a promise was. Anna first struggled with the concept. Although she could not articulate the definition of a promise, she seemed to have grasped the meaning of the word after the judge set out several explanatory examples for her.[15] When Anna grasped the idea, she promised

---

[13] *Q.:* "Does something happen if someone tells a like [*sic*]?"

  *A.:* "Yeah."

  *Q.:* "What happens? Does something happen at school if somebody doesn't tell the truth?"

  *A.:* "Yeah."

  *Q.:* "What happens?"

  *A.:* "They burped but they didn't say excuse me."

[14] *Q.:* "So, [Anna], if I told you I was wearing a red shirt, is that the truth or a lie?"

  *A.:* "The truth."

  *Q.:* "Am I wearing a red shirt?"

  *A.:* "No, a lie."

  *Q.:* "What color is my shirt?"

  *A.:* "Black."

  *Q.:* "This shirt?"

  *A.:* "Gray."

  *Q.:* "Gray. So if I said I'm wearing a red shirt, if I had said [Anna], I'm wearing a red shirt, is that the truth or a lie?"

  *A.:* "Lie."

[15] *Q.:* "Okay. Do you know what a promise is?"

  *A.:* "No."

  *Q.:* "No. Okay. Do you know what it means if I said well, I promise — have you ever heard this before, I promise to be here tomorrow at 9:00; what would that mean to you?"

  *A.:* "This is a hard part."

  *Q.:* "Why is it hard to [*sic*] you think?"

  *A.:* "Because I don't know this part."

to tell the truth.[16] During the course of the judge's exchange with Anna, she communicated her understanding that negative consequences flow from failing to tell the truth.[17]

. . .

*Q.:* "Okay. You can tell me you don't know what a promise is?"

*A.:* "I don't know what a promise is."

*Q.:* "You never heard I promise — how do [*sic*] it go, across [*sic*] my heart, hope to die?"

. . .

*Q.:* "I promise you. I promise that I'm going to give you something?"

*A.:* "I'll give you something tomorrow."

*Q.:* "Is that a promise? What does that mean to you? Have you ever heard the word 'promise'?"

*A.:* "No."

*Q.:* "No? So if I asked you to say well, will you promise me that you're going to tell the truth to the people that are over there?"

*A.:* "Yeah."

*Q.:* "Can you — could you say that?"

*A.:* "I promise I will tell the people over there."

. . .

*Q.:* "So everybody says, well, you know [Anna], I promise that you're going to get a present tomorrow, have you ever been disappointed when the present didn't come?"

*A.:* "Yes. Disappointed when the present didn't come."

*Q.:* "Were you?"

*A.:* "Yes."

*Q.:* "Did that ever happen to you?"

*A.:* "Yeah."

*Q.:* "So if someone said I promise to give you a present tomorrow, not me, just an example, you know, and tomorrow came and there was no present. How would you feel about that?"

*A.:* "Sad."

[16] *Q.:* "Okay. Now, suppose I told you that everybody here believes that you know the difference between the truth and a lie and we expect that you're going to tell the truth."

*A.:* "Yes, I'm going to tell the truth."

[17] *Q.:* "And what would happen if you didn't keep your promise to tell the truth?"

*A.:* "You would be mad at me."

*Q.:* "So if you didn't tell the truth when you promised to tell the truth, would somebody be angry at you?"

*A.:* "Yeah."

. . .

At trial, Anna stated that she knew the difference between the truth and a lie, and that it was good to tell the truth and bad to tell a lie. She correctly identified true and false statements about the color of her shoes and about her clothing that day. Under cross-examination, she testified also that she understood the difference between truth and falsehood, and promised again to tell the truth. She explained that, if she were to lie, "[p]eople will be mad at me and we won't feel like friends any more." Defendant's counsel tested Anna's comprehension of truth and falsehood.[18]

As with the first prong, we do not find error in the judge's determination that Anna possessed the ability to distinguish truth from falsehood, appreciated her duty to tell the truth, and understood that negative consequences would follow from her failure to do so. In the pretrial hearing, her testimony advanced to an understanding of the meaning of a promise. She affirmed her promise to tell the truth. Anna's difficulties with several ancillary questions did not undermine her essential competence. The trial judge's firsthand factual determination was not clearly erroneous and therefore will not be set aside. See *Commonwealth* v. *Tatisos*, 238 Mass. at 325; *Commonwealth* v. *Gamache*, 35 Mass. App. Ct. 805, 806-807 (1994); *Commonwealth* v. *Monzon*, 51 Mass. App. Ct. at 253.

---

*Q.:* "What do you think would happen to you if you didn't tell the truth?"
*A.:* "Everybody would be mad at me."
*Q.:* "And then what would happen?"
*A.:* "You would go away."

[18] *Q.:* "Now, if I were to tell you today that I rode my donkey to work, is that a lie or is that the truth?"
*A.:* "A lie."
*Q.:* "And how do you know that?"
*A.:* (Inaudible).
. . .
*A.:* "Because you didn't bring your donkey."
*Q.:* "Do you know if I own a donkey?"
*A.:* "Yeah."
*Q.:* "You do and do I? Huh?"
*A.:* "No."

On redirect, Anna clarified, through the prosecutor's questions, that she knew that defendant's counsel did not ride a donkey to work because people ride cars, not donkeys, to work.

3. *Taint hearing.* The defendant argues that the judge's refusal to hold a "taint hearing" constitutes reversible error. We disagree.

The defendant relies on *Commonwealth* v. *Allen*, 40 Mass. App. Ct. 458 (1996). There, the defendant argued that his convictions of rape of a child and indecent assault and battery of a child ought to have been reversed because the trial judge had denied his request for a pretrial competency hearing to determine whether preliminary interview techniques had tainted two children's trial testimony to such a degree that it was unreliable. *Id.* at 460. In support of his motions in limine for a competency hearing, the defendant in *Allen* offered a (1) videotape of the children being interviewed by a sexual assault intervention network (SAIN) investigator; (2) expert testimony that techniques utilized during the interview were leading and suggestive; and (3) assertions that the children had been told in advance about the videotaped interview and that they had previously been interviewed, respectively, eight and eleven times by various investigators. *Ibid.* We nevertheless ruled that the judge correctly denied the defendant's motions for a pretrial hearing because the children were competent.

However, the defendant also urged the court to adopt the reasoning of *State* v. *Michaels*, 136 N.J. 299 (1994), in which the New Jersey Supreme Court provided for a "pretrial taint hearing" where a defendant offered "some evidence" showing that suggestive or coercive interview techniques may have rendered a child's testimony unreliable. *Commonwealth* v. *Allen, supra* at 462.

The reasoning of *Allen* does not support the defendant here. In that case we expressly did not reach the proposal for a pretrial taint hearing generally and added specifically that the record lacked any evidence of the suggestive or coercive interviewing necessary to warrant such a hearing under the New Jersey procedure. *Id.* at 462-463. Similarly here the record contains no evidence of coercion, suggestion, or coaching of Anna's testimony deserving consideration of a taint hearing procedure.

4. *Ineffective assistance of counsel.* Finally, the defendant claims for the first time on direct appeal that his trial counsel was ineffective for failing to subpoena Anna's father Dennis to testify at trial. A claim for ineffective assistance should generally begin

by a motion for a new trial. *Commonwealth* v. *Zinser,* 446 Mass. 807, 810 (2006). "[O]ur courts strongly disfavor raising claims of ineffective assistance on direct appeal." *Id.* at 811. We make exception to this rule if the claim "may be resolved on direct appeal of the defendant's conviction when the factual basis of the claim appears indisputably on the trial record." *Ibid.,* quoting from *Commonwealth* v. *Adamides,* 37 Mass. App. Ct. 339, 344 (1994).

The defendant's appellate counsel theorizes that trial counsel should have subpoenaed Anna's father Dennis for examination about his alleged hostile or vengeful motives against his brother, the defendant. In support of the theory, counsel hypothesizes that Dennis disappeared in order to evade testimony and the exposure of his motives at trial. Nothing in the record supports this rationale. Dennis's absence may have resulted from family opposition to the detrimental force of his potential testimony against his brother. Since the cause of his absence remains a matter of speculation and since no other information supports the contention of ineffectiveness, the record is inadequate for consideration of the claim. We decline to review it on direct appeal. See *Commonwealth* v. *Zinser, supra* at 810-812.

*Conclusion.* The trial judge correctly allowed the child's mother to testify as a substitute first complaint witness, properly found the child competent, and rightly refused to conduct a taint hearing. The record is inadequate for consideration of any claim of ineffective assistance of counsel.

*Judgments affirmed.*