## Commonwealth *vs.* Luis A. Figueroa.

No. 10-P-811.

Worcester. February 1, 2011. - April 29, 2011.

Present: Cypher, Trainor, & Meade, JJ.

*Indecent Assault and Battery. Evidence,* Spontaneous utterance, Testimonial statement. *Witness,* Competency, Unavailability, Psychiatric examination. *Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Confrontation of witnesses, Psychiatric examination, Instructions to jury.

At the trial of an indictment charging indecent assault and battery on a person over fourteen years of age in violation of G. L. c. 265, § 13H, there was no error in the admission, as excited utterances, of pretrial statements made by the victim, who was eighty-eight years old and suffering from dementia at the time of trial, where, given that the statements were made in the immediate aftermath of the assault, the judge could properly conclude that the victim was still under the influence of a startling and traumatic event, and that the statements, which both characterized and explained the assault, were not the product of reflective thought [394-396]; further, because the victim had firsthand knowledge of her statements, and the foundational requirements were met, she was sufficiently competent to render admissible excited utterances [396-397]; finally, the admission of the statements did not violate the defendant's right to confrontation under the Sixth Amendment to the United States Constitution, where a reasonable person in the victim's position would not have anticipated that her statements, which were made at a nursing home in response to staff inquiries concerning medical care, would be used against the defendant in investigating and prosecuting a crime [397-399].

A Superior Court judge did not abuse her discretion by denying a criminal defendant's motion seeking a psychological examination of the victim, who was eighty-eight years old and suffering from dementia at the time of trial, where the victim, whose nontestimonial out-of-court statements were admitted in evidence as excited utterances, did not testify at trial. [399-400]

At the trial of an indictment charging indecent assault and battery on a person over fourteen years of age in violation of G. L. c. 265, § 13H, the judge neither erred nor committed an abuse of discretion in declining to give a missing witness instruction, where the Commonwealth had a legitimate, plausible reason for not calling the then eighty-eight year old witness (the victim of the crime), who was suffering from moderate to severe dementia. [400-401]

Indictment found and returned in the Superior Court Department on January 16, 2004.

A motion to compel a witness to undergo a psychological examination was heard by *Frances A. McIntyre*, J., and the case was tried before *Francis R. Fecteau*, J.

*Melissa P. White Ellis* for the defendant.

*Donna-Marie Haran*, Assistant District Attorney, for the Commonwealth.

MEADE, J. After a jury trial, the defendant was convicted of indecent assault and battery on a person over fourteen years of age in violation of G. L. c. 265, § 13H.[1] The victim, who was eighty-eight years old and suffering from dementia at the time of trial, did not testify. On appeal, the defendant claims that the trial judge erred by admitting in evidence the victim's pretrial statements as excited utterances, that the motion judge abused her discretion by denying the defendant's request for the victim to undergo a psychological examination, and that the trial judge erred by refusing to give a missing witness instruction. We affirm.

1. *Background.* a. *Motion in limine.* Prior to trial, the defendant filed a motion in limine to exclude the victim's out-of-court statements based on his assertions that they did not qualify as excited utterances, that they violated his right to confrontation, and that they were "not the product of a competent mind."[2] The trial judge held a voir dire on the motion, from which the following emerged.

In April of 2003, the victim became a patient at the Fairlawn Nursing Home (Fairlawn) in Leominster. The victim was an eighty-six year old woman who suffered from "[e]arly dementia" but was "alert and oriented with some confusion." She would tend to become agitated at night because she would want to go outside by herself, but she was not allowed to as Fairlawn was on a busy street. The victim was very mobile, expressed herself well, and spoke in proper context. She was generally responsible for her own care; she fed and dressed herself, and she read books and newspapers on a daily basis. The victim was continent for "the most part."

On October 13, 2003, Matthew Smith was working the 3:00

---

[1]The defendant was acquitted of rape.

[2]The Commonwealth also filed a motion in limine to admit the victim's statements as excited utterances.

to 11:00 P.M. shift as a certified nursing assistant (CNA) at Fairlawn. At approximately 10:30 P.M., Smith was assisting a patient into bed, and he determined that he needed the help of another CNA. Smith began to search for the defendant, who was also employed as a CNA at Fairlawn. While he looked down the hallway, Smith's attention was drawn to room number twenty-five (room 25) because the door was closed; CNAs were not ordinarily permitted to offer patient care behind closed doors. He went into room number twenty-seven and walked into the bathroom that was shared by room 25.

While he looked into room 25 through the slightly opened bathroom door, Smith could hear some talking and saw the victim's head moving in a "thrusting" motion. The victim was lying across her bed so that her "buttocks was right up flush with the edge of the bed." When he further opened the door, Smith saw that someone's hands were on the victim's shoulders. At this point, Smith entered room 25, which was "completely bright," and pulled back the privacy curtain that was partially covering the victim's bed.

Behind the curtain, Smith saw the defendant standing "flush up against" the victim, between her legs, which were up in the air. The victim was wearing only a shirt and was naked from the waist down. The defendant jumped away from the victim when Smith pulled the curtain back. The defendant's pants were down in the front, and his penis was exposed. The defendant tucked his penis back into his pants and tied the drawstring. When Smith asked the defendant what he was doing, the defendant replied that he was "washing" the victim. Smith told the defendant that he "wasn't washing her; that he was having sex with her." The defendant replied that Smith was "gross" and "sick for assuming that." The defendant was not holding anything in his hands, and there was no indication that the victim had soiled herself.

The victim returned herself to a "regular position in her bed," and Smith covered her with a blanket. The victim asked Smith, "[W]hy do they keep doing this to her," and Smith asked, "[D]oing what?" The victim replied, "[N]ever mind." The defendant was still in the room at this point. The victim was pulling the blankets up over herself, and she looked "frightened" and "very nervous or scared."

When Smith left the room, the defendant followed and implored him not to say anything, claiming that "I would never do that. That's disgusting." Upon seeing Denise Miller, a nurse supervisor, Smith pulled her aside and asked to speak with her privately. In a copier room, Smith was visibly shaking and crying as he told her what he had just witnessed. This conversation lasted less than five minutes. Immediately after speaking with Smith, Miller went straight to the victim's room to speak with her to "see if there was justification for what [Smith] was saying," because she "wasn't going to jump to conclusions." Miller wanted to investigate what had occurred and whether the victim required medical services.

Miller asked the victim "if anything had happened that night," to which the victim replied that "he did that test, again." When Miller asked, "[W]hat test," the victim stated, "[T]hat test he's always done. The one I don't want him to do it, and he doesn't stop." When Miller again asked the victim to clarify what test she was referring to, the victim stated, "[T]he test Dr. Radha ordered to check my insides." When Miller inquired how the defendant did the test, the victim responded that "he puts his thing up me." Miller asked her, "[W]here does he put that thing," and the victim pointed to her vagina. Miller pointed to her vagina and said, "[D]own there," and the victim said, "[Y]es, down there."[3] The victim was upset when she was talking to Miller.

After speaking with the victim, due to the serious nature of the report, Miller found the charge nurse and brought her back into the victim's room because she wanted another nurse to hear the allegation. Almost verbatim, the victim repeated for the charge nurse what she had told Miller. When the defendant returned to the room with a face cloth to wash the victim, the victim "became visibly upset" and said, "[T]hat's him, that's him. He's the one who does the thing." Miller took the face cloth from the defendant and told him that she would do it. Miller was concerned that evidence might be washed away. When she examined the victim's vagina, it was red, but there were no feces on the victim. Following nursing home policy,

---

[3]When Miller was questioning the victim, she was not thinking she was going to have to report it to the police, but after she heard what the victim told her, she knew she would have to notify the police.

Miller contacted the director of nurses and then reported the matter to the police.

William B. Land, a board certified forensic psychiatrist, testified for the defendant as to his opinion of the victim's competency at the time of the incident. Dr. Land did not interview the victim, but he did review her medical records from Fairlawn and concluded that she suffered from dementia and short-term and long-term memory problems. Because of her diagnosis,[4] Dr. Land questioned the victim's reliability in particular because she had no recollection of the incident the following day.

b. *The Commonwealth's case.* Smith and Miller both testified at trial in substantial conformity with their motion in limine testimony. Miller added that the victim's long-term memory was good but that her short-term memory "would be scattered at times." She also testified that the proper procedure for a patient who had an incontinence accident would be to bring the patient into the bathroom, hand them a face cloth, and let them wash themselves.

Leominster police Officers Ryan Malatos and John Bouchard arrested the defendant and transported him to the Leominster police station, where he was "booked." At the police station, the defendant waived his Miranda rights and denied that he had raped anyone. He claimed that the victim had "shit herself" and he was merely cleaning up the mess. Red-faced and nervous, he further claimed that Smith had mistaken a bottle of lotion for his penis.

A few moments later, the defendant had a change of heart and offered to tell the police "the truth." He said that it had been his plan to "hav[e] sex" with the victim. The defendant told the officer that he "stuck each hand on either side of her, and he got her ready for sex." He then spread the victim's legs apart and put them on the sides of the bed. With his pants down and his penis partially erect, the defendant then realized that what he was doing was wrong. The defendant told the police that it was at this moment of conscience that Smith walked into the room.

---

[4]Dr. Land explained the three stages of dementia and the symptoms associated with it. He testified that it was his "sense that [the victim's dementia] was closest to the moderate stage" in October, 2003. He also questioned the reliability of a person with moderate dementia since they often suffer from "paranoid delusions," but agreed that they also have moments of clarity.

c. *The defense.* In his defense, the defendant called Dr. Land, who testified essentially as he had at the motion in limine voir dire. The defendant also offered his own testimony. According to the defendant, the victim was "combative," screamed at people, and "like[d] to hit." On the night of the incident, the defendant reported seeing the victim standing outside her room, not wearing underwear and screaming for help. He explained that he calmed the victim down, brought her into her bathroom, and helped clean the feces off her. The door to the victim's room was closed because the victim was naked; the defendant's search for her underwear was unsuccessful. While the defendant was attempting to help the victim lie down on the bed, Smith "jumped" into the room. The defendant denied that his pants were down, that his penis was exposed, or that he touched the victim's private area. He asked Smith if he was "sick" for thinking he was "fucking her."

Later, while the defendant was doing paperwork, Miller asked for his assistance in calming down the victim. He testified that the victim was screaming, "making like a physical thing with her arms, moving her chair and stuff around," and was asking to go outside. According to the defendant, the victim asked for Dr. Radha and asked, "Why does this keep happening to me." After ten minutes, the victim calmed down and the defendant left the room.

After the defendant wrote a report at Miller's request, the police arrived and arrested him. At the police station, when he was finally told he had been arrested for rape, the defendant "flipped out." He denied raping the victim and provided the police with his exculpatory version of the incident in which he claimed he had merely cleaned the victim. He also denied that he told Officer Malatos that he wanted to tell "the truth."

After the defendant's testimony was completed, the defendant's counsel informed the judge that the defense wanted to call the victim. Counsel claimed that he had subpoenaed the victim and was told she was not available. The prosecutor had no knowledge of such a subpoena. When counsel could not produce a return of service, the defense rested.

2. *Discussion.* a. *Excited utterances.* The defendant claims that the trial judge abused his discretion by admitting the victim's

out-of-court statements as excited utterances, where the foundational requirements were not satisfied and where a determination of the victim's competency had not been made. He also claims that the admission of the victim's out-of-court statements violated his right to confrontation. We disagree.

The admissibility of out-of-court statements is reviewed under a two-step inquiry. *Commonwealth* v. *Linton*, 456 Mass. 534, 548 (2010). First, it must be determined whether the statement is admissible under the Massachusetts "common law of evidence." *Ibid.* If the statement is admissible, then the second step is to determine "whether admission of the statement is prohibited by the confrontation clause of the Sixth Amendment [to the United States Constitution]." *Ibid.* See *Commonwealth* v. *Nesbitt*, 452 Mass. 236, 243 (2008).

A statement which would otherwise be inadmissible as hearsay may be admitted as an excited utterance if it is made following "an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer," and the "statement was a spontaneous reaction to the occurrence or event and not the result of reflective thought." Mass. G. Evid. § 803(2), at 245 (2011). See *Commonwealth* v. *Depina*, 456 Mass. 238, 244-245 (2010); *Commonwealth* v. *Hartnett*, 72 Mass. App. Ct. 467, 474 (2008). An excited utterance may properly be made in the form of answers to specific questions. *Commonwealth* v. *Grant*, 418 Mass. 76, 81-82 (1994). A judge has broad discretion to determine whether the foundational requirements have been met to qualify a statement as an excited utterance. *Commonwealth* v. *DiMonte*, 427 Mass. 233, 236 (1998).

Here, both Smith and Miller testified to the circumstances immediately following and within minutes of Smith's observation of the defendant's sexual assault of the victim. Given that the statements at issue were spoken in the immediate aftermath of the assault, the judge could properly conclude that the victim was still under influence of a startling and traumatic event, and that her statements were not the product of reflective thought. Also, the victim's statements both characterized and explained the assault. See *Commonwealth* v. *Santiago*, 437 Mass. 620, 624-627 (2002).[5] Even though the victim responded "never

---

[5]Whether a declarant's statement tends to qualify, characterize, or explain

mind" to Smith's attempt to clarify what she had said, the evidence permitted the judge to conclude that the victim remained "frightened," "very nervous," and "scared," especially given that the defendant was still present in the room at the time. See *Commonwealth* v. *Davis*, 54 Mass. App. Ct. 756, 761-762 (2002). Because the proper foundation for the statements was established, there was no abuse of discretion in the admission of the victim's statements to Smith and Miller as excited utterances.

Beyond the foundational requirements, the defendant also claims that it was error to admit the victim's statements where the trial judge made no finding that the victim was competent at the time she made them. We disagree. The defendant's claim reads too much into a sentence from *Commonwealth* v. *King*, 436 Mass. 252, 255 (2002), where the Supreme Judicial Court wrote that a declarant of an excited utterance, like any other witness, "must be competent." While this is undoubtedly true, competency for the purposes of an excited utterance is not the same as that for a witness who testifies at trial.[6] *Commonwealth* v. *Tang*, 66 Mass. App. Ct. 53, 64-67 (2006). Competency for a declarant of an excited utterance requires only that the declarant's factual assertion rest on personal knowledge. In other words, the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement. *Id.* at 64-65. No more is required because

"there is a countervailing assurance of reliability in the

---

the underlying event is not an independent third requirement for the admission of an excited utterance. *Commonwealth* v. *Santiago*, *supra* at 625. However, when a statement does meet one of these components, it illuminates the second aspect of the test. *Id.* at 625-626. See Mass. G. Evid. note to § 803(2).

[6]To determine witness competency for the purposes of a trial, a judge must apply a two-prong test: "(1) whether the witness has the general ability or capacity to 'observe, remember, and give expression to that which she ha[s] seen, heard, or experienced'; and (2) whether she has 'understanding sufficient to comprehend the difference between truth and falsehood, the wickedness of the latter and the obligation and duty to tell the truth, and, in a general way, belief that failure to perform the obligation will result in punishment.' " *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 329 (1986), quoting from *Commonwealth* v. *Tatisos*, 238 Mass. 322, 325 (1921). "The same test applies to adults, children, and [those] subject to a disability." *Commonwealth* v. *Thibeault*, 77 Mass. App. Ct. 419, 424 (2010), citing *Commonwealth* v. *Whitehead*, 379 Mass. 640, 656 (1980).

excitement of the event[; therefore,] the other aspects of competency are not applied. Thus, an excited utterance is admissible despite the fact that the declarant was a child and would have been incompetent as a witness for that reason, or the declarant was incompetent by virtue of mental illness."

*Id.* at 65, quoting from 2 McCormick, Evidence § 272, at 209-210 (5th ed. 1999). Because the victim had firsthand knowledge of her statements, and the foundational requirements were met, she was sufficiently competent to render admissible excited utterances. The judge did not abuse his discretion by refusing to make further inquiry on competence or to conduct a voir dire on the matter. See *id.* at 66.

b. *The confrontation clause.* The defendant further claims that the admission of the victim's excited utterances violated his Sixth Amendment right to confrontation. We disagree. The Sixth Amendment imposes "a complete bar to the admission of out-of-court statements that are determined to be testimonial unless (1) the declarant is available at trial or (2) the declarant is formally unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant." *Commonwealth* v. *Gonsalves,* 445 Mass. 1, 6 (2005), cert. denied, 548 U.S. 926 (2006), citing *Crawford* v. *Washington,* 541 U.S. 36, 68 (2004).

There is a " 'two-step procedure for distinguishing testimonial from nontestimonial statements.' . . . The first step is to determine whether the statements are testimonial per se." *Commonwealth* v. *Nesbitt,* 452 Mass. at 243, quoting from *Commonwealth* v. *Burgess,* 450 Mass. 422, 429 (2008). Statements "made in response to questioning by law enforcement agents are per se testimonial, except where the questioning is meant to secure a volatile scene or to establish the need for or provide medical care." *Commonwealth* v. *Nesbitt,* 452 Mass. at 243, quoting from *Commonwealth* v. *Gonsalves, supra* at 3. Out-of-court statements made in response " 'to questions from people who are *not* law enforcement agents' and 'statements offered . . . without prompting, regardless of who heard them,' are not testimonial per se" (emphasis in original). *Commonwealth* v. *Nesbitt,* 452 Mass. at 244, quoting from *Commonwealth* v.

*Burgess, supra.*[7] Statements that are not testimonial per se must "be examined to determine if they are nonetheless testimonial in fact by evaluating whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime." *Commonwealth* v. *Nesbitt*, 452 Mass. at 244, quoting from *Commonwealth* v. *Gonsalves, supra* at 3. Out-of-court statements that are deemed testimonial per se or testimonial in fact are inadmissible unless the declarant is available to testify or the defendant had a prior opportunity to cross-examine. *Commonwealth* v. *Nesbitt*, 452 Mass. at 244. Nontestimonial out-of-court statements do not give rise to a right of confrontation and may be admitted "if the admission is consistent with Massachusetts evidence law." *Ibid.*

The defendant argues not that the victim's statements are testimonial per se but rather that they are testimonial in fact. We disagree. The incident at issue took place in a nursing home where the eighty-six year old victim, who suffered from dementia, was a patient. The inquiries made by Smith and Miller, in the informal setting of the victim's room, were related to medical care even though they were made in an effort to determine what had occurred. The victim's response, which indicated that the defendant had done "the test" again, further demonstrates that the victim understood the question to be about her medical condition. Contrary to the defendant's argument, the focus of the testimonial-in-fact inquiry is not on those who heard the statements but, rather, on an objective view of a reasonable person in the declarant's position. See *Commonwealth* v. *Gonsalves, supra* at 12-13. Thus, the fact that Miller knew she would have to notify the police about the assault does not inform

---

[7]*Crawford* v. *Washington* and its United States Supreme Court progeny have all involved statements made in response to police inquires. The Supreme Court has expressly reserved the question "whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " *Michigan* v. *Bryant*, 131 S. Ct. 1143, 1155 n.3 (2011), quoting from *Davis* v. *Washington*, 547 U.S. 813, 823, n.2 (2006). Here in the Commonwealth, "both steps of the test set forth in *Commonwealth* v. *Gonsalves*, [*supra* at 13], continue to apply to statements made to people other than law enforcement officers." *Commonwealth* v. *Simon*, 456 Mass. 280, 298 n.10, cert. denied, 131 S. Ct. 181 (2010).

the inquiry.[8] Instead, a reasonable person in the victim's position would not have anticipated that her statements would be used against the defendant in investigating and prosecuting a crime. See *Commonwealth* v. *Linton*, 456 Mass. at 550. There was no error.

c. *Psychological examination.* Prior to trial, the defendant moved pursuant to Mass.R.Crim.P. 14, as amended, 444 Mass. 1501 (2005), to have an expert conduct a psychological examination of the victim. After a hearing, the motion judge denied the motion. On appeal, the defendant claims that the denial of his motion violated his right to confront his accuser. We disagree.

Jettisoning his reliance on rule 14, the defendant now claims that the motion judge "unquestionably had the authority to order an evaluation" of the victim pursuant to G. L. c. 123, § 19. Section 19 provides: "In order to determine the mental condition of any party or witness before any court of the commonwealth, the presiding judge may, in his discretion, request the department [of mental health] to assign a qualified physician or psychologist, who, if assigned shall make such examinations as the judge may deem necessary." G. L. c. 123, § 19, inserted by St. 1986, c. 599, § 38.

An examination of the text of § 19 reveals that there was no abuse of discretion. See *Commonwealth* v. *Hiotes*, 58 Mass. App. Ct. 255, 256 (2003) (denial of motion made pursuant to G. L. c. 123, § 19, reviewed for an abuse of discretion). Simply enough, the victim was not a "witness before any court of the commonwealth." G. L. c. 123, § 19. See *Commonwealth* v. *Widrick*, 392 Mass. 884, 887-888 (1984) (G. L. c. 123, § 19, "enhanc[es] a trial judge's jurisdiction to determine a party's or a witness's competency to *testify at trial*" [emphasis supplied]). That the victim's nontestimonial out-of-court statements were admitted in evidence as excited utterances does not change that equation. Similarly, the defendant cannot claim that the victim "was obviously the essential witness" for the Commonwealth and that the Commonwealth, by not calling her, violated his

---

[8]In any event, Miller testified at the motion in limine hearing that when she questioned the victim, she was not thinking she was going to have to report it to the police. It was only after she heard what the victim told her that she knew she would have to notify the police.

right to confrontation. Not only is it the prosecutor's choice to decide which witnesses are essential to the Commonwealth's case,[9] but the Sixth Amendment is not a freewheeling construct of the defendant's imagination. Rather, "the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination" (emphasis in original). *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 52 (1987). See *Kentucky* v. *Stincer*, 482 U.S. 730, 738 n.9 (1987). However, the right to confrontation "does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Pennsylvania* v. *Ritchie*, *supra* at 53. The motion was properly denied.

d. *Missing witness instruction.* Finally, the defendant claims the trial judge erred by refusing to give a missing witness instruction, asserting that the victim was "the sole alleged victim of the alleged assault" and, as such, the Commonwealth "would naturally offer her as a witness." We disagree.

The decision to provide a missing witness instruction to the jury is "within the discretion of the trial judge, and will not be reversed unless the decision was manifestly unreasonable." *Commonwealth* v. *Saletino*, 449 Mass. 657, 667 (2007). A missing witness instruction is appropriate when a party " 'has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case,' and the party, without explanation, fails to call the person as a witness." *Ibid.*, quoting from *Commonwealth* v. *Anderson*, 411 Mass. 279, 280 n.1 (1991). However, "if the circumstances, considered by ordinary logic and experience, suggest a plausible reason for nonproduction of the witness," the jury should not be given the instruction. *Id.* at 282-283.

Here, the trial judge properly denied the defendant's request for a missing witness instruction. The Commonwealth had a legitimate, plausible reason for not calling the then eighty-eight

---

[9]One could conclude from a fair reading of the record that Smith, an eyewitness to the defendant's sexual assault, was the essential witness for the Commonwealth.

year old victim, who was suffering from moderate to severe dementia. See *Commonwealth* v. *Saletino, supra* at 668 (missing witness instruction "should not be given where the Commonwealth has legitimate tactical reasons for not calling the witness"). In fact, the record shows and all parties agreed that the victim was not competent to testify at trial despite no formal determination of competency. There was neither error nor an abuse of discretion in not giving the instruction.[10]

*Judgment affirmed.*

---

[10]Contrary to the defendant's claim, the judge was not required to give the instruction because he permitted the defendant to make a missing witness argument in his summation. Because the foundation for the instruction was not established, permitting the argument to be made provided the defendant with more than that to which he was entitled. See *Commonwealth* v. *Saletino, supra* at 672-673.