NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08635

COMMONWEALTH  vs.  ANTHONY BARRY
(and nine companion cases[1]).


Middlesex.     October 5, 2018. - February 12, 2019.

Present:  Gants, C.J., Gaziano, Lowy, & Budd, JJ.


Homicide.  Proximate Cause.  Evidence, Exculpatory, Police
    report, Disclosure of evidence.  Deoxyribonucleic Acid.
    Constitutional Law, Fair trial, Confrontation of witnesses.
    Due Process of Law, Fair trial.  Fair Trial.  Practice,
    Criminal, Capital case, New trial, Discovery, Fair trial,
    Confrontation of witnesses, Disclosure of identity of
    informer.



    Indictments found and returned in the Superior Court
Department on July 23, 1999.

    The cases were tried before Robert A. Barton, J.; a motion
for a new trial, filed on May 17, 2002, was heard by Elizabeth
Butler, J.; and a second motion for a new trial, filed on
November 20, 2014, was heard by Robert B. Gordon, J.


    Rosemary Curran Scapicchio (Jillise McDonough also present)
for Anthony Barry.
    Claudia Leis Bolgen for Brian Cahill.
    Casey E. Silvia, Assistant District Attorney (Timothy
Ferriter, Assistant District Attorney, also present) for the
Commonwealth.

_____

    [1] Four against Anthony Barry and five against Brian Cahill.

LOWY, J.  Shortly after midnight on April 17, 1999, Kevin McCormack and Brian Porreca were part of a group leaving a bar in Malden with plans to continue their night at a club in Boston.  They never made it.  As the group prepared to leave, Porreca saw two longtime friends, Anthony Barry and Brian Cahill, run up to the vehicle that the group was entering.  While Cahill stayed on the passenger side of the vehicle, shooting an Uzi at it, Barry fired a handgun into the back of McCormack's head as he sat in the driver's seat.  Porreca and one of the women in their group were also shot, and Porreca retreated into the bar.  Based largely on Porreca's testimony, Barry and Cahill were convicted of murder in the first degree.[2]

The defendants each filed two motions for a new trial, each of which was denied.  Their direct appeal is consolidated with their appeal from the denial of those motions, and they argue that multiple reversible errors occurred both during and after trial.  We consider whether (1) there was sufficient evidence to support each defendant's murder conviction; (2) the Commonwealth withheld exculpatory evidence in violation of Brady v. Maryland,

---

[2] Each defendant was also convicted of armed assault with intent to murder, G. L. c. 265, § 18 (b); two counts of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b); and unlawful possession of a firearm, G. L. c. 269, § 10 (a).

373 U.S. 83 (1963); (3) newly discovered evidence warranted a new trial; (4) expert testimony regarding deoxyribonucleic acid (DNA) violated the defendants' rights to confrontation and due process; (5) the defendants' right to a public trial was violated; (6) discovery violations implicated the confrontation clause; and (7) a motion for the disclosure of a confidential informant's identity was erroneously denied.  We affirm.

Background.  1.  The shooting.  We recite facts that the jury could have found and that are necessary to resolve the defendants' appeal, reserving some facts for later discussion. Porreca met some friends, including McCormack, at a bar in Malden on the night of April 16, 1999.  While there, Porreca drank four or five beers before he, McCormack, Lindsay Cremone, Kristen Terfry, Stephen Almeida, and John Whitson decided to go to a club in Boston.  The group left the bar at 12:15 A.M. on April 17 and proceeded to Cremone's sister's car.  McCormack sat in the driver's seat, Terfry sat in the front passenger seat, Cremone sat in the rear driver's side seat, and Porreca was preparing to enter the rear seat on the passenger's side[3] when he heard voices in the parking lot and looked up to see Barry and Cahill running in their direction.  The men wore dark hoods that covered their ears, hair, and heads, but left their faces

_____

[3] Stephen Almeida had gone back into the bar to get John Whitson.

exposed. Cahill ran toward the passenger's side of the vehicle and fired a nine millimeter Uzi-type semiautomatic weapon into it, striking McCormack several times and shooting Porreca and Cremone twice each. Porreca had seen Barry running toward the driver's side of the car, and Cremone testified that a man ran to the driver's side of the vehicle, put a gun to McCormack's head, and shot him.

After being shot, Porreca observed Cahill turning toward the vehicle and heard "a lot of gunshots" as he retreated into the bar. From the back seat, Cremone heard "two different types of firing." As Porreca entered the bar, he yelled "call 9-1-1" and approached Whitson, with whom the group had been socializing earlier. Porreca exclaimed, "Fuck'n Barry and Cahill" to Whitson, and approached Gene Giangrande's[4] girlfriend and told her to "[t]ell Gene I'm going to blow his fuck'n head off." Porreca explained that he said this because "[i]t was Gene Giangrande's crew, his friends who had just shot me, and I was mad at him."

A .40 caliber pistol was found on the ground next to the driver's side of the vehicle. The Uzi used in the attack was found by two teenagers walking home at approximately 2:30 A.M.

---

[4] Gene Giangrande was a local bookmaker and drug dealer for whom Brian Porreca collected debts and who was best friends with Anthony Barry. Both defendants were part of Giangrande's "crew."

on April 17 on the sidewalk of Whitman Street, close to the bar. One of the teenagers who found the Uzi took it home, unloaded it, and hid it in the basement of his house before turning it in to the Malden police the following day.

2. <u>Porreca's background</u>. Porreca grew up in Medford and was friends with each of the defendants. Porreca introduced the defendants to each other in 1994 or 1995, after which the defendants became "close." Porreca was also friends with Giangrande, an area bookmaker and drug dealer; William Angelesco, a friend of Giangrande's who was known to be connected with organized crime; and McCormack, the victim. Porreca was a former professional boxer and collected debts owed to Giangrande, who would pay him in cash or with Percocet pills. Porreca had a lengthy criminal history. The jury also heard evidence of Porreca's substance abuse. He admitted to being addicted to opiates and having consumed two or three Percocet pills on the morning of the shooting.

At the time of the murder, Porreca was under Federal investigation for his involvement in the kidnapping of an area drug dealer that took place in 1995 (kidnapping). Allegedly, Porreca and another man, in an attempt to determine the location of a shipment of marijuana from Mexico, kidnapped the drug dealer and brought him to a house in Medford. The man was tied up, sprayed with lighter fluid, and questioned as Porreca held a

gun and another man held a lighter. After approximately one hour, Porreca and the other man released the kidnapped party. In early April 1999, Porreca received a summons to appear before a Federal grand jury, and met with several members of law enforcement to discuss the likely charges against him. Porreca left that meeting believing that he was facing fifteen or more years in prison if he did not cooperate with law enforcement; and if he did, his likely sentence would be reduced to approximately five years.

3. <u>Additional trial evidence</u>. The jury also heard testimony of the police investigation into the shooting. Porreca was interviewed by police at the hospital and was initially uncooperative. He first said that "two white guys" whom he knew had conducted the shooting, but later stated that it was actually "two black guys." Eventually, Porreca told a State police trooper investigating the shooting that he would identify the shooters in exchange for a promise that he would not go to prison for his involvement in the kidnapping. Porreca received such an assurance from the United States Attorney's office, agreed to cooperate, and identified the defendants to the police.

Pursuant to search warrants, police searched Cahill's residence in Randolph and recovered an ammunition can with a sticker from an army-navy style surplus store in Malden with a

large pair of Hatch-brand leather gloves. A search of Barry's apartment in Melrose also yielded two Nomex hoods[5] and an extra-large pair of Hatch gloves in a box with two bulletproof vests. The owner of the surplus store testified that two young men loosely matching the defendants' descriptions had purchased two pairs of Hatch gloves (one large and one extra-large), two Nomex hoods, and a can of .30 caliber ammunition one week before the shooting. A DNA expert testified that a saliva sample found on one of the Nomex hoods found in Barry's apartment matched Cahill's DNA.

A medical examiner testified about the autopsy he performed on McCormack. Detailing McCormack's injuries, he first described the gunshot wound to McCormack's head and offered his opinion that that wound alone was lethal. He further testified about a separate, independently lethal gunshot wound to McCormack's back. The bullet removed from McCormack's head was a .40 caliber bullet that matched the pistol left on the scene, while the second lethal wound was caused by an undetermined, but different, caliber bullet. One .40 caliber shell casing was recovered from the crime scene, found in the backseat of the car, and fourteen nine millimeter shell casings were found on

---

[5] Nomex hoods were described as similar to those worn by football players or law enforcement in cold weather; they adhere tightly to the head but reveal much of the wearer's face, including the eyes, nose, and cheeks.

the scene -- thirteen on or around the car and one on the floor of the car.

4. <u>First motion for a new trial</u>. In 2002, approximately two years after trial, the defendants filed their first motion for a new trial.[6] After a three-day evidentiary hearing, the motion was denied.[7] The primary arguments in the first motion centered on evidence discovered after trial that the defendants contended would have assisted their attack on Porreca's credibility. They also presented evidence that suggested that Giangrande and Angelesco had admitted to others that they, rather than the defendants, were the shooters.

The defendants maintained that the Commonwealth intentionally withheld evidence that Porreca was brought by police to Saints Memorial Hospital in Lowell on April 21, 1999, four days after the shooting, where he complained that he was in heroin withdrawal. In those records, medical staff noted that Porreca stated to them to be "drug sick" and that one of the police officers accompanying him indicated that he had been vomiting for most of the previous night. At the evidentiary hearing, two doctors opined about Porreca's medical records.

---

[6] We limit our discussion of the decision on the first motion for a new trial to the lone portion that the defendants assert was erroneous.

[7] The trial judge did not preside over the motion for a new trial.

One of the doctors described the effects of opiate withdrawal and indicated that Porreca's behavior at the hospital was consistent with being in withdrawal, and that Porreca's actions immediately after the shooting were consistent with being intoxicated at the time.  In contrast, the doctor who treated Porreca testified that, although he did not remember treating Porreca, he also did not document any symptoms of withdrawal.  The treating doctor also testified that the records suggested that Porreca was not in withdrawal during the visit.  The judge who heard the first motion for a new trial (first motion judge) credited the testimony of the doctor who had treated Porreca.

The defendants contended that the Commonwealth withheld these medical records in violation of Brady, 373 U.S. at 87, which requires that the Commonwealth disclose to defendants all exculpatory evidence in its control.  The first motion judge ultimately held that, although the medical records were exculpatory and were in the Commonwealth's possession, the defendants were not prejudiced by the Commonwealth's failure to produce the records because they were cumulative of other evidence presented at trial and did not "carry a measure of strength in support of the defendant."  Commonwealth v. Bregoli, 431 Mass. 265, 272 (2000), quoting Commonwealth v. Tucceri, 412 Mass. 401, 414 (1992).

5.  Second motion for a new trial.  The defendants filed a second motion for a new trial in November 2014, raising several issues, including an argument that the Commonwealth withheld newly discovered pieces of exculpatory evidence.  The motion was denied following a nonevidentiary hearing, the judge (second motion judge)[8] having deemed an evidentiary hearing unnecessary because the defendants did not raise a serious question under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), and the briefs, transcripts, and supporting documents were sufficient to allow the second motion judge to make an informed decision.

The defendants maintained that police reports discovered after trial constituted Brady violations, and that six pieces of newly discovered evidence cast doubt on the convictions and warranted a new trial.  As the defendants now assert error in the denial of this motion for each of these pieces of evidence, we briefly detail each piece in turn.

a.  Orlando reports.  The defendants discovered two reports authored after the trial by Sergeant Nunzio Orlando of the State police (Orlando reports), one dated July 17, 2001, and the other dated July 25, 2001.  The July 17 report was heavily redacted

---

[8] The judge who decided the second motion for new trial was neither the trial judge nor the judge who decided the first motion for a new trial.

and described information gleaned from a confidential informant, who stated in part that "Angelesco 'got straightened out' because he shot and killed 'Mucka' McCormack in Malden." The July 25 report indicated that Angelesco had become a "made member" in the Boston mafia and that he had "'earned his bones' by killing 'Mucka' McCormack." The informant also stated that "Anthony Barry was not the shooter in the McCormack murder. Barry was behind the scenes as far as orchestrating McCormack's assassination, but Angelesco and Cahill were the actual shooters. In addition, Gene Giangrande allegedly drove the getaway vehicle." The second motion judge analyzed these two reports under Brady and determined that they were not possessed by the Commonwealth, were not exculpatory because they would not have been admissible at trial, and were not prejudicial because they would not have had an impact on the jury's conclusion.

b. Montana report. A report written by Sergeant David Montana of the Medford police department (Montana report) relayed a conversation he had with an individual who implicated a third party, Robert Rennell, as the shooter in McCormack's murder. This individual further stated that "there was no way that Anthony Barry" was the shooter, and that Porreca had contacted him indicating that he was willing to alter his testimony in exchange for $100,000. The second motion judge concluded that the Montana report had not been possessed by the

prosecution, was inculpatory despite appearing exculpatory on its face because of the fruits of subsequent police investigation, and was not prejudicial because it was unlikely to have had an impact on the jury's conclusion.

c. Bureau of Alcohol, Tobacco, Firearms and Explosives report. The final asserted Brady violation raised in the second motion for a new trial concerned an unredacted version of a report from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF report) detailing an interview of Porreca conducted on April 21, 1999. In the redacted version of the report, which the defense possessed at the time of trial, Porreca stated that he had spoken to a friend of McCormack, Johnnie Decologero, at the bar on the night of the shooting and that Barry did not get along with Decologero's brother, Paul. The unredacted version indicated, among other things, that Paul Decologero had initiated the 1995 kidnapping for which Porreca was under Federal investigation in 1999.

The second motion judge determined that neither version of the ATF report was exculpatory, particularly because even the redacted version named the defendants as the shooters. He further concluded that the defendants had not established that the unredacted version of the report, created by a Federal agency, was ever in the possession of the Commonwealth. Finally, the judge determined that the defendants did not

establish that they were prejudiced by not possessing the unredacted ATF report.

d. <u>Newly discovered evidence</u>. The second motion judge also considered the defendants' argument that six pieces of newly discovered evidence would have had an impact on the jury's verdicts. Those pieces of evidence include a third report authored by Orlando on July 26, 2001,[9] additional evidence of Porreca's drug use, an affidavit from Whitson, an affidavit from Brittany Cahill, evidence that Angelesco had committed a different murder, and evidence that police intimidated potential witnesses prior to the hearing on the first motion for a new trial. The motion was denied, and the judge reached the following conclusions: (1) the absence of the July 26 Orlando report did not undermine the denial of the first motion for a new trial; (2) the evidence regarding Porreca's drug use was cumulative, not newly discovered, and insufficient to warrant a new trial as it went merely to credibility; (3) Whitson's affidavit, which contradicted Porreca's testimony that he had cursed Barry's and Cahill's names to Whitson after retreating into the bar following the shooting, was reasonably discoverable

---

[9] The only evidence in the July 26 Orlando report that was not included in the first two Orlando reports was a discussion of a dispute at a strip club in Rhode Island where Angelesco allegedly attempted to calm the situation by telling a Rhode Island man involved in the same organized crime syndicate that they were "with the same people."

at the time of trial and cumulative of other testimony undercutting Porreca's recollection; (4) Brittany Cahill's affidavit, in which she recanted portions of her testimony against her brother, was inconsequential to the jury's verdicts; (5) evidence that Angelesco was indicted for and acquitted of a different murder with loose factual similarities to McCormack's death would not have been admissible at the defendants' trial as evidence of a third-party culprit; and (6) the defendants' argument that law enforcement targeted potential witnesses with search and arrest warrants to discourage them from testifying at the hearing on the first motion for a new trial was meritless because the actions of the police were the result of a long investigation.

e. DNA expert. The defendants' second motion for a new trial also challenged the DNA testimony at trial, asserting that their constitutional right to confrontation had been violated because the DNA expert had not conducted the testing. The second motion judge determined that the expert, who was the director of the laboratory where the DNA was analyzed, discussed his laboratory's procedures and then opined that the DNA found in saliva on the Nomex hood was a near certain match to Cahill's DNA. The judge held that, because the expert was referring to his own conclusions based on a report that he was involved in creating, he was not a substitute expert and the defendants'

right to confrontation was not implicated. The judge further concluded that the defendants' challenge to the reliability of the DNA testing itself, which was based on testing of only eight DNA loci, was unfounded. The judge noted the expert's testimony that using eight loci was an accepted method in the scientific community and observed that the defendants failed to establish that the method was unreliable.

f. Court room closure. The defendants asserted that the trial judge's practice of conducting a hardship inquiry of jurors outside the presence of the defendants and their counsel, as well as the exclusion of members of the defendants' families during jury selection, constituted constitutional violations warranting a new trial. The second motion judge concluded that the hardship inquiry was not a critical stage of the proceedings and therefore did not implicate the defendants' constitutional rights. Additionally, the judge found that the argument regarding the exclusion of family members from jury selection was waived because it had neither been preserved at trial nor raised in the first motion for a new trial, and that the defendants failed to establish that it created a substantial risk of a miscarriage of justice.

Discussion. The defendants' appeals from the denial of their motions for a new trial have been consolidated with their direct appeals from their convictions of murder in the first

degree.  We review both under G. L. c. 278, § 33E, and consider asserted errors in the motions for a new trial "to determine whether there has been a significant error of law or other abuse of discretion, . . . and whether any such error creates a substantial likelihood of a miscarriage of justice." Commonwealth v. Vargas, 475 Mass. 338, 355 (2016), quoting Commonwealth v. Lally, 473 Mass. 693, 698 (2016).

1.  Sufficiency of the evidence.  The defendants maintain that the evidence presented at trial was insufficient to establish which gunshot wound was fatal, and that the trial judge's denial of their motions for a required finding of not guilty was therefore error because they were both tried as principals rather than on a joint venture theory.[10]  We review the denial of a motion for a required finding of not guilty to determine "whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged."  Commonwealth v. Whitaker, 460 Mass. 409, 416 (2011), quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and

_____

[10] The defendants' trial took place before this court's decision in Commonwealth v. Zanetti, 454 Mass. 449 (2009), which the Commonwealth notes changed its practice in pursuing a theory of joint venture liability in cases like this.

460 Mass. 12 (2011).  See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

The defendants challenge only the Commonwealth's proof of causation.  "It is well established that there may be more than one proximate cause of a victim's death."  Commonwealth v. Maynard, 436 Mass. 558, 563 (2002).  The conduct of two or more persons is each a proximate cause of death if the conduct concurrently contributes to the death.  Id. at 564.  Such "[a] cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death."  Id.

We conclude that the evidence and the reasonable inferences that stem from it, when considered in the light most favorable to the Commonwealth, were sufficient to convict both defendants.  The medical examiner determined that two separate gunshot wounds, one to the head and one to the back, were each "in and of [themselves] lethal."  The medical examiner noted McCormack's cause of death as "multiple gunshot wounds."  The two gunshots were fired from two different weapons.  The gunshot to the head was from a .40 caliber firearm.  The gunshot to the back was from a different firearm of an undetermined caliber.  The witness described the two defendants as the only two shooters.

We find support in several past decisions of this court. The Maynard case and Commonwealth v. Perry, 432 Mass. 214 (2000), involved a victim who was subjected to numerous blunt

force injuries and starvation over several months by the respective defendants. Maynard, 436 Mass. at 559-561. Perry, 432 Mass. at 215-219. In those cases, which each considered the same murder, the medical examiner testified that he could not determine which act was fatal, but that "the cumulative effect of the beatings and starvation led to the victim's death." Perry, supra at 220-221. See Maynard, supra at 563. We concluded that there was sufficient evidence to convict the defendants under both principal and joint venture theories of liability. Id. at 565. Perry, supra at 221. In this case, the evidence that the defendants caused McCormack's death is much stronger than it was in the Perry and Maynard cases. The judge's denial of the defendants' motion for a required finding of not guilty was proper.

2. First motion for a new trial. The defendants maintain that the Commonwealth intentionally withheld hospital records from a visit Porreca made to Saints Memorial Hospital on April 21, 1999. Porreca complained that he was in heroin withdrawal and requested methadone, and the defendants argue that the temporal proximity of this withdrawal to the shooting would have undermined Porreca's testimony that he was not influenced by drugs at the time of the shooting. This, the defendants contend, prejudiced their defense in such a way that their first motion for a new trial should have been allowed.

"Evidence is exculpatory if it 'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Commonwealth v. Watkins, 473 Mass. 222, 231 (2015), quoting Commonwealth v. Daniels, 445 Mass. 392, 401-402 (2005). "To obtain a new trial on the basis of nondisclosed exculpatory evidence, a defendant must establish (1) that 'the evidence [was] in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control'; (2) 'that the evidence is exculpatory'; and (3) 'prejudice.'" Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017), quoting Commonwealth v. Murray, 461 Mass. 10, 19, 21 (2011). The first motion judge determined, and we agree, that the defense did not make a specific discovery request that encompassed Porreca's medical records.[11]  Where no specific request for a particular

---

[11] The defendants maintain that we should depart from the first motion judge's determination and conclude that one portion of their 1999 discovery motion should be considered a specific request for documents including records of Porreca's visit to Saints Memorial Hospital on April 21.  That request was made as follows:  "Any material relating to the witness' mental or physical history that tends to impair or reflect adversely on his reliability as a witness, including but not limited to any information that would tend to affect the witness' motive to testify or ability to perceive, recall, or understand events."  The defendants' discovery motion was amended, and the section in question was edited to state:  "Any material [that] would tend

piece of evidence is made, we determine prejudice using the same standard "used to assess the impact of newly discovered evidence, that is, 'whether there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial.'"  Murray, supra at 21, quoting Commonwealth v. Tucceri, 412 Mass. 401, 413 (1992).  "Newly discovered evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial." Sullivan, supra at 383, quoting Commonwealth v. Lo, 428 Mass. 45, 53 (1998).

Because we agree with the first motion judge that there is no substantial risk of an impact on the verdicts had evidence of Porreca's trip to Saints Memorial Hospital been before the jury, we need not address the other two factors underlying a new trial motion on the basis of nondisclosed exculpatory evidence.  See Sullivan, 478 Mass. at 380.  Porreca was extensively cross-examined over the course of two days, during which he admitted that he was addicted to opiates, had often been paid in Percocet

to affect the witness' motive to testify or ability to perceive, recall, or understand events."  We agree with the judge that Porreca's medical records were not specifically requested, in either the original or amended motion, as a specific request puts the prosecutor on "notice of exactly what the defense desired."  United States v. Agurs, 427 U.S. 97, 106 (1976).  Cf. Commonwealth v. Healy, 438 Mass. 672, 680 n.9 (2003) (defendant's request for "'reports of mental or physical examinations and of scientific tests' qualifies as a 'specific request'" for "postmortem report").

pills by Giangrande, had consumed two or three Percocet pills on the day of the shooting, and had consumed five or six beers while at the bar immediately before the shooting.  He denied having been under the influence, at the time of the shooting, of the Percocet pills that he had consumed earlier in the day, reasoning that he had consumed only two or three pills and that he would have needed to consume approximately five pills to feel any effect "because [his] system had been used to them." Porreca also testified that he had been given Percocet while in the hospital after the shooting, and was prescribed an additional ten Percocet pills on his discharge from the hospital on April 19.

Given this testimony, the exculpatory nature of the evidence of Porreca's complaint of heroin withdrawal four days after the shooting was cumulative of evidence already before the jury, and we are not persuaded that it would have had an impact on the jury's verdicts.  Porreca's drug use was well established, and he admitted that he consumed Percocet pills and drank several beers on the day of the shooting.  His credibility was called into question extensively on cross-examination on several grounds, not limited to his drug use, and the jury nonetheless convicted the defendants.  See Commonwealth v. Dubois, 451 Mass. 20, 28 (2008) ("The weight and credibility of the evidence is the province of the jury").  The Saints Memorial

Hospital records, at most, would have provided additional grounds to impeach Porreca on the truthfulness of his testimony regarding his sobriety on the night of the shooting. Commonwealth v. Lykus, 451 Mass. 310, 326 (2008) (evidence cumulative of that "admitted at the trial will carry little weight"). See Sullivan, 478 Mass. at 380. Had those records been available to the defense, there would not have been an impact on the jury's verdicts.

3. Second motion for a new trial. The defendants raise several arguments stemming from the denial of their second motion for a new trial. We address each in turn.

a. Decision not to hold evidentiary hearing. We first address the defendants' contention that the second motion judge's decision to proceed without an evidentiary hearing was error. We disagree. Under Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001), a judge must determine whether the defendants' motion presents a "substantial issue" in deciding whether an evidentiary hearing is necessary. Commonwealth v. Denis, 442 Mass. 617, 628 (2004). "Although the motions and supporting materials filed by a defendant need not prove the issue raised therein, they must at least contain sufficient credible information to cast doubt on the issue" in order to create a substantial issue. Id. at 629. In determining whether a substantial issue exists, "a judge

considers the seriousness of the issues raised and the adequacy of the defendant's showing on those issues." Commonwealth v. Torres, 469 Mass. 398, 402-403 (2014).  Whether to hold an evidentiary hearing is a decision squarely within the judge's discretion, and we review the decision for an abuse of discretion.  Denis, supra at 628.

The second motion judge determined that an evidentiary hearing was unnecessary because the defendants did not raise a serious question and because the briefs, supporting documents, and trial transcripts were sufficient to allow him to reach an informed decision.  We conclude that the record before the judge and the contents of the reports and affidavits that formed the basis for the legal arguments raised in the second motion for a new trial did not require an evidentiary hearing, and that the judge's decision that an evidentiary hearing was not warranted was a proper exercise of his discretion.  See Commonwealth v. McWilliams, 473 Mass. 606, 622-623 (2016).

b.  Police reports.  We next address the defendants' argument that the judge erred in declining to find a Brady violation.  The defendants, having discovered additional law enforcement reports after their first motion for a new trial had been decided, presented three claimed new Brady violations based on those reports.  The judge did not err in concluding that there were no Brady violations.

i.  <u>Montana report</u>.  The Montana report detailed an interview conducted by a member of the Medford police department during which an individual implicated a third party as the shooter in McCormack's murder, indicated that "there was no way" that Barry was the shooter, and stated that Porreca had told the individual that he was willing to change his testimony in exchange for $100,000.  As there was no specific discovery request that encompassed this report, we analyze any error to determine "whether there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial."  <u>Murray</u>, 461 Mass. at 21, quoting <u>Tucceri</u>, 412 Mass. at 413.  Assuming without deciding that the Montana report satisfies the first two prongs of <u>Brady</u>, we conclude that there was no prejudice because the defendants cannot establish that the Montana report creates a substantial risk that the jury would have reached a different conclusion had it been admitted.  See <u>Murray</u>, <u>supra</u> at 19-21.

The Montana report implicates a potential third-party culprit who had not otherwise been considered in the investigation.  However, the report does not indicate the basis for the statement that Barry could not have been the shooter.  See <u>Tucceri</u>, 412 Mass. at 414 (if evidence "does not carry a measure of strength in support of the defendant, the failure to disclose that evidence does not warrant the granting of a new

trial"). Finally, to the extent that evidence of Porreca's willingness to alter his testimony in exchange for money could have been used to impeach his credibility, "evidence that tends merely to impeach the credibility of a witness will not ordinarily be the basis of a new trial." Sullivan, 478 Mass. at 383, quoting Lo, 428 Mass. at 53. Moreover, any additional impeachment evidence, unsupported by details and uncorroborated by additional evidence, would not have influenced the jury's conclusion because Porreca's credibility was already very much called into question on cross-examination. We therefore conclude that there was no prejudice.

We further note that the individual who provided the information in the Montana report wrote an affidavit that undermines the exculpatory nature of the Montana report and led to an investigation that further inculpates the defendants. That person stated that he did not remember telling Sergeant Montana that Rennell shot McCormack or that Porreca stated that he was willing to change his story and that neither of those things is true. He further discussed his relationship with an area drug dealer who had tried to sell him stolen guns from New Hampshire, and eventually sold Barry a .40 caliber pistol. The pistol left at the scene of the shooting that was used to shoot McCormack in the head was confirmed to be a gun that had been stolen from a person in Derry, New Hampshire.

A motion for a new trial may be granted "if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b). The exculpatory nature of the Montana report has since been recanted and prompted police investigation that directly tied Barry to one of the murder weapons. As we are considering whether substantial justice was done, we see no reason that we cannot consider additional evidence that stemmed from that police investigation.[12] With the fruits of that investigation in mind, any argument that this report would warrant a new trial in the interests of justice is disingenuous.

ii. ATF report. The defendants' asserted Brady violation stemming from the unredacted ATF report also fails, because the ATF report was not exculpatory. The report's only mention of McCormack's murder is that Porreca stated, "Anthony Barry, one of the shooters along with Brian Cahill, didn't get along with Paul A. Decologero." The defendants, however, maintain that Porreca's cooperation with law enforcement and the ATF report's

---

[12] The defendants contend that the second motion judge violated their right to due process by relying on evidence that the Commonwealth obtained after the defendants' convictions. The Montana report led police to discover, among other things, evidence that Barry had purchased the .40 caliber pistol that was left in the bar's parking lot and matched the bullet recovered from McCormack's skull. Because we have concluded, without considering that evidence, that there was no Brady violation stemming from the Montana report, any error by the judge in relying on later discovered evidence implicating Barry would be harmless. See Commonwealth v. Amirault, 424 Mass. 618, 649 (1997).

discussion of the involvement of Decologero in the kidnapping provide for the possibility of a third-party defense, because the ATF report could arguably indicate that Decologero had motive to kill Porreca.  But the ATF report inculpates the defendants by saying that they were the shooters.  Any motive that could be gleaned from the ATF report would not be a significant enough aid to the defense to be deemed exculpatory.

iii.  Orlando reports.  Lastly, we address the three Orlando reports.  Although the second motion judge treated the July 26, 2001, Orlando report as newly discovered evidence and reviewed the July 17 and July 25 reports under Brady, we review all three Orlando reports as newly discovered evidence because they were all created after trial.  "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction."  Commonwealth v. Grace, 397 Mass. 303, 305 (1986).  As a threshold matter, newly discovered evidence "must be material and credible."  Id.  We conclude that the contents of the Orlando reports are not credible and therefore cast no doubt on the convictions.

The confidential informant in the Orlando reports told Trooper Orlando that he did not have firsthand knowledge of who the shooters were, that he was not present at the time of the murder, and that his information that Angelesco was the shooter

and Giangrande the getaway driver was based on "word on the street." "'[W]ord on the street' carries no indicia of reliability by itself, and defense counsel did not bolster it by showing that the 'word' came from a percipient witness to the shooting." Commonwealth v. Silva-Santiago, 453 Mass. 782, 804-805 (2009).[13] Because unsubstantiated rumors pointing to Angelesco and Giangrande as the true culprits do not cast doubt on the justice of the convictions, the existence of the Orlando reports does not require a new trial.

c. Additional newly discovered evidence. In their second motion for a new trial, the defendants also relied on five additional pieces of purportedly newly discovered evidence: (1) additional evidence of Porreca's drug use[14]; (2) an affidavit from Whitson; (3) an affidavit from Brittany Cahill; (4) evidence that Angelesco had committed a different murder; and (5) evidence of intimidation of potential witnesses before the hearing on the first motion for a new trial. Evidence is newly discovered if it was "unknown to the defendant or his counsel

---

[13] The standard articulated in Commonwealth v. Silva-Santiago, 453 Mass. 782 (2009), regarding the standard of admissibility for evidence offered in support of a defense under Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980), was recently clarified in Commonwealth v. Moore, 480 Mass. 799, 809 n.9 (2018). Otherwise, the Silva-Santiago decision remains binding.

[14] The defendants do not contest the second motion judge's ruling relating to Porreca's intoxication.

and not reasonably discoverable by them at the time of trial (or at the time of the presentation of an earlier motion for a new trial)."  Grace, 397 Mass. at 306.  Newly discovered evidence "must [also] carry a measure of strength in support of the defendant's position," and will carry less weight if it "is cumulative of evidence admitted at the trial."  Id. at 305-306.

  i.  Whitson affidavit.  Whitson's affidavit indicates that he was inside the bar when the shooting took place outside, that he spoke to Porreca after Porreca had been shot, and that Porreca "did not mention the names of Anthony Barry and Brian Cahill" to him.  Whitson's affidavit directly contradicts a key portion of Porreca's testimony at trial, where Porreca stated that he ran into the bar after being shot and said "Fuck'n Barry and Cahill" to Whitson.  However, the defendants have failed to establish that the contents of Whitson's affidavit were unknown to their counsel at the time of trial.  When Porreca was about to testify that he had implicated the defendants to Whitson after being shot, Barry's counsel was heard at a sidebar conference.  Counsel told the trial judge that "Whitson was interviewed by the grand jury and by police, he has denied that this statement was made . . . by Porreca to him."  Because defense counsel knew before trial that Whitson had said Porreca never implicated the defendants, Whitson's affidavit is not "newly discovered."  See Grace, 397 Mass. at 306.

ii. <u>Brittany Cahill affidavit</u>. Brittany Cahill testified against her brother and Barry at trial when she was fourteen years old. Her testimony indicated that Cahill and Barry planned to be together the night of the shooting, that Cahill laughed when reading a newspaper article about the shooting, that Cahill talked to himself while laughing as he drove by the bar three days after the shooting, that Cahill was counting $900 in cash three days after the shooting at a time in which he was unemployed, and that Cahill told her, in a telephone call from jail several weeks after the shooting, not to give information to the police.

Her 2009 affidavit recanted portions of her testimony, in particular denying that Cahill had laughed while reading the newspaper, that he had laughed and talked to himself while driving past the bar, or that he had stated that the $900 he was counting was from "doing his business." She further indicated that her false testimony was the result of pressure from Trooper Manning, whom she claims said to her, among other things, that she would get in trouble if she did not testify against her brother. Assuming without deciding that Brittany Cahill's affidavit constitutes newly discovered evidence, her recantation is ultimately inconsequential to the outcome of the trial. There was significant evidence pointing to the defendants as the shooters, and although Brittany Cahill's testimony did have some

corroborative value to the Commonwealth's case, "the absence of [her recanted] testimony at trial would not have changed the verdict[s]." Commonwealth v. Spray, 467 Mass. 456, 472 (2014). See Grace, 397 Mass. at 306 ("The strength of the case against a criminal defendant . . . may weaken the effect of [newly discovered] evidence").

iii. Evidence that Angelesco committed a different murder. The defendants next contend that they were entitled to a new trial because of evidence that Angelesco was indicted for a different murder that had similar facts to McCormack's murder. In that unrelated murder, of which Angelesco was acquitted, a gun was left at the scene, as was the case in McCormack's murder. Evidence of this separate murder is irrelevant to any third-party culprit defense the defendants may have raised at trial and would not have been admissible. "[I]n order to be admitted, third-party culprit evidence 'must have a rational tendency to prove the issue the defense raises, and [it] cannot be too remote or speculative.'" Commonwealth v. Scott, 470 Mass. 320, 327 (2014), quoting Silva-Santiago, 453 Mass. at 801. See Commonwealth v. Brusgulis, 406 Mass. 501, 506 (1990) (modus operandi evidence only admissible if there is "a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents"). This evidence does not warrant a new trial.

iv. _Witness intimidation_. The defendants' final argument from their second motion for a new trial stems from their first motion for a new trial, as they allege that members of the State police intimidated five witnesses the defendants intended to call at the hearing on the first motion by executing search and arrest warrants against them. There is nothing in the record to suggest that those warrants were illegitimate, and the arrest reports note that they were the product of a "lengthy investigation." The criminal complaints against these five potential witnesses detail ongoing narcotics activity, and the defendants have provided no evidence to support their claims that law enforcement used these arrests as a means to dissuade the potential witnesses from testifying at the hearing on the first motion for a new trial.[15] The burden was on the defendants to prove the facts underlying their motion; as they failed to do so regarding their witness intimidation claim, their argument regarding the second motion for a new trial fails. See Commonwealth v. Marinho, 464 Mass. 115, 123 (2013) ("A defendant bears the burden of proof on a motion for new trial").

v. _Court room closure_. Cahill maintains that his right to a public trial was violated when the trial judge conducted the hardship voir dire in the jury room without counsel or

_____

[15] One of the men did, in fact, testify at the hearing on the first motion for a new trial.

defendants present, and when the defendants' family members were excluded from the court room during jury selection. Because Cahill failed to object to either alleged error at trial, the claims are procedurally waived. See Commonwealth v. Robinson, 480 Mass. 146, 152 (2018) ("where a defendant fails to contemporaneously object to an improper court room closure at trial, we have steadfastly held that the defendant's claim is procedurally waived").[16] Therefore, we review any error for a substantial likelihood of a miscarriage of justice, and having found nothing that calls into question the legitimacy of the jury's verdicts, we conclude that the defendants' motion for a new trial was properly denied on these grounds. See id. at 154-155.

vi. DNA. The defendants challenge the second motion judge's determination that the DNA expert who testified at trial

---

[16] Cahill urges us to revisit our waiver rules in light of the United States Supreme Court's decision in Weaver v. Massachusetts, 137 S. Ct. 1899 (2017). He argues that, under Weaver, a failure to make a public trial objection at trial constitutes waiver only for defendants who raise the issue for the first time on appeal as part of an ineffective assistance claim rather than as a public trial claim. But in Commonwealth v. Robinson, 480 Mass. 146, 154 (2018), a case decided after Weaver, we observed that this is a distinction without a difference: "For purposes of determining whether the defendant's claim was properly preserved at trial, it is . . . legally irrelevant that [the defendant] now presents the claim as a Sixth Amendment violation rather than a claim that his counsel provided ineffective assistance by failing to perceive and object to the closure."

was not a substitute expert and that their claim that the method of testing was unreliable was unfounded. The defendants did not object to the DNA expert's testimony at trial, so we review their claim to determine whether there was error in allowing him to testify and, if so, whether that error created a substantial likelihood of a miscarriage of justice. We conclude that there was no error.

The expert was the director and vice-president of the laboratory where the testing took place, he detailed the procedure that would have taken place to test the samples, and he testified that, after reviewing the DNA samples, he had determined that the DNA found on the Nomex hood matched Cahill's DNA profile. He observed that "the probability of drawing at random a DNA pattern like that of Mr. Cahill's is one in [181] billion [among Caucasians]."

"The critical issue with respect to an expert, including in particular a DNA analyst, is whether the defendant is able to cross-examine the expert in a meaningful way regarding possible flaws relating to the underlying data that forms the basis of his or her opinion." Commonwealth v. Chappell, 473 Mass. 191, 201 (2015). The defendants' rights were protected in this case, because the DNA expert participated in the analysis of the samples and testified about a report detailing his conclusions that he personally submitted to the prosecution. He was not a

substitute expert, and his testimony did not implicate the confrontation clause. See Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011) ("The accused's right is to be confronted with the analyst who made the certification . . ."). Cf. Commonwealth v. Tassone, 468 Mass. 391, 399 (2014) ("our common law of evidence requires that the defendant have a meaningful opportunity to cross-examine the expert about her opinion and the reliability of the facts or data that underlie her opinion"). Even if he were considered a substitute expert, his testimony would have been admissible because there is no requirement that the person who physically tested DNA samples testify, and it is well established that an expert can testify to his own opinions after interpreting data and reaching his own conclusions. See Commonwealth v. Sanchez, 476 Mass. 725, 733 (2017); Commonwealth v. Greineder, 464 Mass. 580, 601-602, cert. denied, 571 U.S. 865 (2013); Commonwealth v. Barbosa, 457 Mass. 773, 791 (2010), cert. denied, 563 U.S. 990 (2011). Cf. Chappell, supra at 202 ("under Massachusetts law, an expert witness is not permitted to testify on direct examination to facts or data that another, nontestifying expert has generated, or to the nontestifying expert's own opinion, even though this information may be an important part of the basis of the testifying expert's opinion").

The defendants further assert that the DNA testing, which compared Cahill's blood sample and the DNA sample from the Nomex hood using eight loci, was unreliable when considered in light of subsequent scientific advancements. The defendants contend that because testing involving thirteen loci would "offer[] a material improvement in accuracy," there was a substantial likelihood of a miscarriage of justice. See Commonwealth v. Donald, 468 Mass. 37, 45-46 (2014) (analysis using thirteen loci reduced probability of random match to one in several trillion or quadrillion). However, the defendants have not called into question the legitimacy of the expert's conclusion that the probability of a random match was one in 181 billion. That another method of testing may have yielded an even more reliable result does not create a substantial likelihood of a miscarriage of justice.

vii. Pretrial disclosure and the confrontation clause. The defendants asserted in their second motion for a new trial that the failure to turn over medical evidence regarding Porreca's drug use violated their right to confrontation. The second motion judge gave little credence to this argument, because it is well established that the right to confrontation is a trial right and is inapplicable to pretrial discovery under both art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution. See

Commonwealth v. Figueroa, 79 Mass. App. Ct. 389, 400 (2011), quoting Pennsylvania v. Ritchie, 480 U.S. 39, 53 (1987).  The defendants now ask us to depart from precedent and extend the right to confrontation.  We decline to do so.

"[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused."  Crawford v. Washington, 541 U.S. 36, 50 (2004).  "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination."  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009), citing Crawford, supra at 54.  The right to confrontation, under both art. 12 and the Sixth Amendment, has been considered to be a trial right.  Figueroa, 79 Mass. App. Ct. at 400.  There was no error in the second motion judge's treatment of the right to confrontation as such, and we conclude that there is no reason to depart from that interpretation.

4.  Identity of confidential informant.  In December 2015, the defendants filed a discovery motion seeking, in part, the disclosure of the identity of the confidential informant discussed in the Orlando reports.  The motion was denied.  The second motion judge determined that the Commonwealth had

established that disclosing the informant's identity would endanger the informant, and that the defendant failed to show that the "informant privilege" interfered with a fair defense. The defendants now contend that the judge erred in denying the motion. We conclude that there was no error.

The defendants contend that the Orlando reports indicate that the confidential informant had firsthand knowledge that Angelesco, not the defendants, murdered McCormack, and that Giangrande "drove the getaway vehicle." As discussed supra, the Commonwealth filed an affidavit by Sergeant Orlando clarifying that the confidential informant did not have firsthand knowledge, was not a percipient witness, and did not hear the information from Angelesco or Giangrande, but rather learned it through "word on the street." The Commonwealth withheld the confidential informant's identity under the "informant privilege." The informant privilege "may be asserted where the Commonwealth otherwise would be required to provide an informant's identity to a defendant as part of its discovery obligations."[17] Commonwealth v. Bonnett, 472 Mass. 827, 846 (2015). The privilege's rationale "is the need to encourage 'citizens to communicate their knowledge of the commission of

---

[17] There is apparently no disagreement that, absent assertion of the informant privilege, the identity of the confidential informant would be discoverable under Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004).

crimes to law-enforcement officials.'" <u>Id.</u>, quoting <u>Roviaro</u> v. <u>United States</u>, 353 U.S. 53, 59 (1957).

Determining whether an informant's identity was properly withheld requires a two-step inquiry. In the first stage, we must determine "(a) whether the Commonwealth has properly asserted an informant privilege, and (b) whether the defendant has adequately challenged the assertion of the privilege as an impermissible interference with his or her right to present a defense." <u>Bonnett</u>, 472 Mass. at 846. The Commonwealth may assert the privilege only where "disclosure would endanger the informant or otherwise impede law enforcement efforts." <u>Id</u>. at 847. If the Commonwealth has properly asserted the privilege, "the defendant may request that the privilege be set aside on the grounds that it 'interferes with a fair defence.'" <u>Id</u>., quoting <u>Commonwealth</u> v. <u>Johnson</u>, 365 Mass. 534, 544 (1974). In so requesting, a defendant must "present 'some offering so that the trial judge may assess the materiality and relevancy of the disclosure to the defense,'" but only if it "is not apparent from the nature of the case and the defense offered thereto." <u>Bonnett</u>, <u>supra</u>, quoting <u>Commonwealth</u> v. <u>Kelsey</u>, 464 Mass. 315, 323 (2013).

If the Commonwealth properly invoked the privilege and the defendants adequately challenged the assertion of the privilege, then we move to the second step and balance "the public interest

in protecting the flow of information against the [defendant]'s
right to prepare his defense." Commonwealth v. Dias, 451 Mass.
463, 468 (2008). In doing so, we consider "the crime charged,
the possible defenses, the possible significance of the
[privileged] testimony, and other relevant factors." Id. at
468-469, quoting Roviaro, 353 U.S. at 62.

We agree with the second motion judge that the Commonwealth
properly invoked the informant privilege. As the Commonwealth
noted, the individuals identified in the Orlando reports have a
history of violent crimes, including against witnesses in this
case.[18] The threat of violence against witnesses posed by these
individuals has been so great that a single justice of this
court ordered the deposition of Porreca before trial, out of
concern that he would be killed before testifying. Porreca
remained in hiding for at least eighteen months before the
defendants' trial, in part out of fear of retribution by
Angelesco and Giangrande.

We also agree with the second motion judge that the
defendants failed to challenge adequately the assertion of the
privilege. While the confidential informant's identity and the

--------

[18] Angelesco pleaded guilty to the 2006 stabbing of a
witness who, at the hearing on the defendants' first motion for
a new trial, had accused Angelesco of committing the murder.
The State police have also received reports that Angelesco and
Giangrande were seeking retribution against another witness who
implicated them in the killing.

information that might be gained from the informant was certainly relevant to the defendants' theory, the defendants failed to establish its materiality.  The confidential informant provided no details "beyond a threadbare rumor" to support his allegation that Angelesco and Giangrande committed the murder.  Bonnett, 472 Mass. at 849.  The confidential informant was also not a percipient witness and had not learned the information from a percipient witness or the alleged killers.  Contrast id. ("At a minimum, the question whether the informant was a percipient witness to the shooting, or whether he had spoken to a percipient witness, should have been explored").  Rather, the confidential informant was merely relaying inadmissible, immaterial "word on the street" information about the killing. We conclude that the judge properly denied the defendants' motion for disclosure of the confidential informant's identity.[19]

     5.  Review under G. L. c. 278, § 33E.  Having carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to order a new trial or to reduce the degree of guilt.

                         Judgments affirmed.

---

     [19] Because we agree that the defendants failed to establish the materiality of the confidential informant's identity, we do not reach the balancing test that constitutes the second stage of the analysis.